IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 4, 2026

IN RE TRISTAN J.

Appeal from the Juvenile Court for Davidson County
No. PT279217      Sheila Calloway, Judge
_____

No. M2025-00583-COA-R3-PT
_____

The Tennessee Department of Children's Services ("DCS") sought the termination of the mother's and father's parental rights to their son in the Juvenile Court for Davidson County ("the Juvenile Court"). The Juvenile Court found that DCS had failed to prove the statutory grounds for termination of the mother's parental rights by clear and convincing evidence. Although the Juvenile Court found sufficient evidence for grounds for termination of the father's parental rights, it declined to find that termination was in the child's best interest given that the mother retained her parental rights. The guardian *ad litem* ("GAL") appealed, and DCS joined in filing briefs arguing that the Juvenile Court erred. Upon careful review, we find that the Juvenile Court misapplied the law in its consideration of the ground of persistent conditions and provided insufficient findings of fact addressing relevant testimony in its consideration of both persistent conditions and failure to manifest an ability and willingness to assume custody as alleged against the mother. The Juvenile Court also provided conclusory statements for each best interest factor that it considered in relation to the father. We accordingly vacate the Juvenile Court's judgment and remand this case for the Juvenile Court to properly apply the law in its analysis of persistent conditions against the mother and provide sufficient findings of fact in support of its conclusory statements in its analysis of persistent conditions and failure to manifest an ability and willingness to assume custody against the mother. We also remand for the Juvenile Court to provide factual findings in support of its conclusions as to the best interest factors applied to the father.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed in Part, Vacated and Remanded in Part; Case Remanded**

D. KELLY THOMAS, JR., SP. J., delivered the opinion of the court, in which ANDY D. BENNETT and CARMA DENNIS MCGEE, JJ., joined.

Thomas H. Miller, Guardian Ad Litem, Franklin, Tennessee, appellant, pro se.

Jonathan Skrmetti, Attorney General and Reporter, and Amber L. Barker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Brigid M. Caldwell, Hermitage, Tennessee, for the appellee, Bria B.

Laura A. Stewart, Nashville, Tennessee, for the appellee, James J.

**OPINION**

**BACKGROUND**

In December 2021, DCS filed a petition for emergency removal of Tristan J. ("the Child") from the custody of his mother, Bria B. ("Mother") and putative father, James J. ("Father").[1] DCS explained that on November 29, 2021, police responded to a call about the Child, who had been found unsupervised in a parking lot near the entrance of an apartment complex. Mother had left the Child alone at their apartment after she was called back to work at the Family Dollar to address $500 that was missing from a safe. Although she expected to be gone for only half an hour, DCS alleged that Mother had left the Child alone for about two hours. The DCS case manager was unable to interview the Child because he had a severe speech delay. Mother was arrested and charged with child neglect of a child aged eight or younger. DCS alleged that the Child was dependent and neglected based on Mother's lack of supervision. Father's whereabouts were unknown. The Child was born in August 2017, making him four years old at the time of this incident.

The Juvenile Court entered an emergency custody order, finding probable cause that the Child was dependent and neglected, placing the Child in DCS's temporary care and custody, and ordering the appointment of a GAL for the Child. The Juvenile Court entered an order adjudicating the Child dependent and neglected. Mother did not contest DCS's petition.

On October 20, 2023, DCS filed a petition to terminate Mother's and Father's parental rights to the Child. DCS alleged the following grounds for termination against Father: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) substantial noncompliance with permanency plan; (4) failure to manifest an ability and willingness to assume custody; and the grounds applicable to putative fathers, including (5) failure to manifest an ability and willingness to assume custody by a putative father, (6) risk of substantial harm to the child, (7) failure to make reasonable child support payments by a putative father, (8) failure to seek reasonable visitation by a putative father, and (9) failure to file a petition to establish paternity within thirty days after notice of paternity.

---

[1] In March 2024, the Juvenile Court entered a parentage order, finding Father to be the biological and legal father of the Child.

- 2 -

With respect to Mother, DCS alleged the following grounds: (1) abandonment by failure to support, (2) substantial noncompliance with permanency plan, (3) persistence of conditions, and (4) failure to manifest an ability and willingness to assume custody. DCS further alleged that termination of both parents' rights was in the Child's best interest.

A two-day trial was held in December 2024. The Juvenile Court heard testimony from Mother; Father; Carlee Lammers, a clinical therapist; Tameka Applewhite-Joseph, a family intervention specialist who supervised parent-child visits; Ben Irom, the DCS family service worker assigned to the case; and Mersadiez B., the Child's foster mother ("Foster Mother").

Ms. Lammers, a clinical therapist who has provided mental health counseling to the Child since February or March 2024, testified that the Child had been diagnosed with autism and post-traumatic stress disorder, had difficulty regulating his behavior, struggled with transitions, and could be aggressive with strangers. The Child started going to therapy with Ms. Lammers when his negative behaviors escalated. Ms. Lammers stated that the Child had punched a pregnant woman in a moment of dysregulation and had engaged in angry outbursts. He had difficulties in school and had been suspended multiple times. She worked with the Child to help him learn to regulate his negative behaviors and process past trauma. Based on Ms. Lammers' testimony, it was clear that being left home alone had left an impression on the Child as he reenacted the scene using dolls.

Ms. Lammers testified that the Child loves Mother but that he is still angry at Mother for leaving him home alone and canceling visits. She testified that he was confused about his relationship with Mother because he loves her but has been hurt by her. The Child has expressed to her that he does not want to visit Mother. She explained that the Child was "a little bit all over the place with that" and that they are still working on making sense of his story. She explained that she would like to see the Child regulate his behaviors with more ease before she introduces Mother to the Child's therapy, although she also acknowledged that there were some things she could do to help Mother learn to support his needs and work with his diagnosis without integrating her into the Child's therapy sessions.

Ms. Lammers testified that the Child has stated that he is scared when Mother is in his personal space. Ms. Lammers stated that this does not concern her in terms of safety but rather in terms of Mother understanding his needs. Before integrating Mother into therapy, Ms. Lammers would like to hear the Child express that he is not scared and that he wants to see Mother. Ms. Lammers testified that the Child told her that Mother called him fat during one visit, which made him sad. Before integrating Mother into therapy sessions with the Child, Ms. Lammers testified that she would need to assess Mother's ability to take ownership of her role in the Child's trauma.

Ms. Lammers testified that she has witnessed the Child become dysregulated during therapy and that he has cried and chewed on on a sensory chew toy that is designed for

- 3 -

children with autism to chew on. She testified that the Child thrives on routine and stated that Foster Mother is a regulating force on the Child. The Child trusts Foster Mother and feels emotionally safe with her. She, however, testified that the Child has reported that he feels triggered by his foster siblings when they talk about their own trauma. Ms. Lammers testified that the Child has made a lot of progress and has felt safer to discuss his emotions, although she suspected he would need therapy for a long time and possibly the rest of his life.

Ms. Applewhite-Joseph testified that she has supervised Mother's visits with the Child since October 2023. When asked about some initial difficulties with visitation, Ms. Applewhite-Joseph testified:

> I had observed [Mother] being a little defensive towards me, and sometimes with some hostility initially. That kind of went on throughout my time with the family. And also when it came to some things dealing with [the Child], just having to kind of redirect conversations and behaviors and stuff of that nature, which is part of what we do.

Ms. Applewhite-Joseph further stated that Mother was not receptive when she would try to give her information about the Child's behavior at school before visits or information from the Child's doctor's appointments.

Ms. Applewhite-Joseph gave the following example:

> There was an incident where I feel that [Mother] and I had a situation that was kind of escalated.

> What had happened that particular day, the foster parent had gave me some instructions, like she always does, to tell the parent. And as I was trying to explain it to the parent, she just kind of walked off and didn't acknowledge what I was saying.

> And this particular information was important, because [the Child] had just started back having -- well, had started having seizures. And he had, like, a chew toy that he had to have and some other things that needed to be done. And Mom just kind of, like, ignored me. She became a little combative to where that particular day I had to end the visit, and we didn't have a visit that day because she was being verbally aggressive.

Ms. Applewhite-Joseph stated that she thought Mother had been in denial of the Child's diagnosis and was dismissive of the Child's concerning behaviors. She testified that Mother would often respond to her by stating that the Child does not exhibit negative behaviors around her. According to Ms. Applewhite-Joseph, Mother did not feel as though

- 4 -

she should have to help the Child with his homework during visits and that she thought homework help was the foster parents' job.

Ms. Applewhite-Joseph described one instance in June 2024 when Mother reacted negatively to the Child's "sensory chew toy." She explained:

> Well, whenever he had the sensory toy, and when she first initially saw it, what she said was that she took it because he was chewing on it. She took it out of his mouth. And she said, you're not a dog; you don't need this.

> And so I explained what it was, because he had started, like, grinding his teeth and chewing on things that -- and so I explained what it was, but she wasn't very happy about the fact that he had that.

Mother's reaction made the Child stop chewing on the toy. Ms. Applewhite-Joseph later stated:

> I told her what it was for, because he had just started the chewing thing. But like I testified to, communication with [Mother] has not always been the best.

> A lot of times when I'm informing her of things, she would ignore me, not acknowledge what I was saying or just walk by. So I know that it was heard, but she never responded to it, which was kind of typical at the time, like, when I would tell her things.

> So she was aware of what it was, but I'm not sure to what degree of understanding she had of it.

Although Ms. Applewhite-Joseph stated that the Child is not "dysregulated" during visits, she further testified that she had witnessed the Child have meltdowns after visits. One time when she called to check in on the Child after a visit, she heard the Child screaming in the background, and Foster Mother told her that the Child had attacked everyone in the home and that she was trying to calm him down. Like Ms. Lammers, Ms. Applewhite-Joseph testified that the Child has difficulty with transitions and that he likes to stick to a routine. She also stated that the Child would get anxious when Mother was running late to a visit because he does not handle disruptions in routine well. She explained that her "biggest concern was his behaviors after the visitations."

Nevertheless, Ms. Applewhite-Joseph testified that her interactions with Mother over the last few months have been good experiences and that she does not feel the hostility from Mother that she used to. The Child appears happy when Mother arrives at visits. Ms. Applewhite-Joseph testified that her greatest concern is Mother's lack of understanding of

the Child's needs and diagnosis and that there is a disconnect between his needs and her understanding.

Mother acknowledged her mistake in leaving the Child home alone when he was only four years old. Mother testified that the Child returned to her home in December 2021 for a trial home visit. However, during this trial home visit, she sent the Child to live with her mother in Huntsville, Alabama in January 2022 in order to get her house in order. The Child lived in Alabama with his grandmother for two months. The Child's presence in Alabama and Mother's failure to comply with services resulted in DCS ending the trial home visit and the Child's return to foster care.

In terms of her employment, Mother testified that she works in "construction cleanup" for a "temp agency" called "Staff Zone," which she considered her "backup job." She has worked for Staff Zone off and on for seven years and stated that it is a reliable job when she is in a pinch. She travels to Huntsville, Alabama primarily for her role with Staff Zone, although she can request jobs in Tennessee. She is also a certified nursing assistant ("CNA"). She was working for a nursing home facility as a CNA up until two-weeks prior to trial. Although she initially said she left that job for better pay, she later acknowledged she was fired. She testified that the longest she has kept the same job since the Child was removed from her custody was ten months.

Mother stated that she planned to work only on weekends if the Child is returned to her custody so she can tend to his needs during the week. She stated that she can make enough income on weekends to support the Child. Mother rents an apartment in Lewisburg and pays $1,299 per month in rent.

Mother testified that she only started paying child support a month ago because she "didn't really know it was super important" because she was paying for "stuff he needs and wanted." Mother testified that she provided the Child with toys and food during her visitation. She testified that the value of these items was greater than the $37 per month she was ordered to pay. She stated that she brought something for the Child every visit. She paid off the entirety of her child support arrearage in two lump sums before trial, resulting in her being two months behind on her rent.

When asked how many visits she had missed, Mother mentioned only one visit that was cancelled because the Child's foster parents said the Child had Covid. Mother later testified that the foster parents had cancelled other visits if the Child had a bad day at school or was not feeling well. Mother stated that Foster Mother was "the one that normally canceled visits." When asked whether she visited at all in April 2023, Mother stated that her car broke down for a month or two but that she did virtual visits with the Child.

When asked whether the Child was verbal or nonverbal at the time of removal, Mother testified that he was both, that he could "speak half English, half baby language."

When asked why Mother did not like that the Child was being taught sign language in foster care, Mother explained that she thought it was taking his time away from school and that the Child can speak English but has trouble speaking it because she thought "he just liked the attention when he'd switch up the language."

Mother denied calling the Child fat and instead asserted that she only called him "big," as in he had grown tall. Mother did not deny telling the Child to take the sensory chew toy out of his mouth and that he is not a dog but stated that she did not know the purpose of the toy at that point. Mother also stated that she does listen to the information provided by Ms. Applewhite-Joseph but if Mother does not give Ms. Applewhite-Joseph the attention she wants from her, Ms. Applewhite-Joseph "makes the visit all about her when it's supposed to be about" the Child. When asked about the veracity of Ms. Applewhite-Joseph's testimony that Mother stated that homework help was the foster parents' job, Mother responded that she merely asked if she and the Child could enjoy their visit instead of doing homework. However, she helped him with homework every time he had homework.

Mother testified that she observed the Child's various therapies through video. She has attended all but two Child and Family Team Meetings and most foster care review boards. She said that she does not attend the Child's medical appointments because no one informs her when they are. She testified that she has completed several mental health assessments and the accompanying recommendations. However, she could not recall what those recommendations were.

Father testified that he knew that he was the Child's father at the Child's birth. However, he acknowledged that he had not filed a petition to establish paternity until after DCS filed the petition to terminate his parental rights. Although Father's testimony was not exactly clear, Father explained that he had been incarcerated on two separate occasions during the custodial period. Father stated that he always stays employed when he is not incarcerated. Father admitted that he knew he had an obligation to support the Child and that he had never provided any such support.

Father testified that he has visited the Child once via a video call during the custodial period. Father's lack of contact with the Child and Mother is demonstrated by the fact that he assumed the Child was in Mother's custody until 2023 and did not find out the Child was in foster care until he received mail from DCS after his release from prison. Father lives with his grandparents who he says do not want a child in their house. Father's license has been revoked, and he has no means of transportation. When asked if he has ever cared for a child with autism, Father stated, "It can't be hard." He stated that he was not currently in a position to assume custody of the Child.

Mr. Irom, the family services worker assigned to the case since June 2024, testified that he was unable to reach Mother until October 2024. Despite his efforts to contact

- 7 -

Mother, she did not answer his emails or messages. Mr. Irom stated:

> I think she's very defensive when she talks to me, and I realized that she lies a lot about, you know, you never message me or you never email me or send me messages. And I'm like, here are all of the text messages; is your phone number correct?
>
> And she would say, yes, and she would message me back with the same phone number I had for her. I said, I wasn't able to reach you. She said, oh, I didn't know who you were. And I'm like, well, I introduced myself multiple times, and here, this is who I am.

Mr. Irom testified that he had conducted a home visit of Mother's apartment in October 2024. When he asked to see her bedroom, Mother told him that he was not allowed in there. As he was leaving, Mother changed her mind and allowed him to view her room. He described it as "very messy." There was a bed frame but no mattress. Mother "couldn't really answer" when he asked her where her mattress was. Mr. Irom testified that the Child's foster home is "very organized," "very loving", and "very supportive" and that his foster parents provide for all of his needs. He also testified that the Child is bonded with all of his foster siblings.

When asked about Mother's ability to care for the Child long-term, Mr. Irom stated that the Child requires routine and a parent who is able to "show up." He testified that Mother lacks the ability to show up and be consistent with her behavior. For instance, he testified that Mother does not consistently attend the Child's occupational and speech therapy sessions via the video link she is provided. When asked whether Mother's testimony raised some red flags for him, Mr. Irom testified: "Yeah, just the whole situation with her income, knowing that she obviously doesn't have a job anymore, and we don't have any proof of any other job. So she's not able to provide anything financially, and she's behind on payments."

He stated that he thought Mother minimizes the Child's condition and does not understand how to parent in general or how to parent a child with autism. When asked about what DCS has done to help Mother understand autism, Mr. Irom testified that "DCS provided her a lot of resources. Foster Mom has provided her resources, books, everything that she needs to know about autism." He provided the following list of the Child's diagnoses: "autistic disorder, global developmental delay, anxiety, sensory symptoms, mixed repetitive expressive language disorder, feeding problem, mild intermittent asthma, intoeing gait, and PTSD." These diagnoses require the Child to have many different appointments, which Foster Mother drives him to.

Foster Mother testified that the Child had been in her home continuously since his initial removal in November 2021, with the exception of the trial home visit between

- 8 -

December 2021 and April 2022. The Child was nonverbal when he first arrived in Foster Mother's home and it took several months in her home for the Child to become verbal. She testified that Mother had unenrolled him from speech therapy during the trial home visit and that when the Child returned after the trial home visits, he did not look kept, had matted hair, and came back with no clothes or the things she sent him with when he left for the trial home visit. At the time of trial, the Child was in occupational therapy, feeding therapy, speech therapy, and typically physical therapy, although this was on hold at the time.

Foster Mother testified that Mother did not regularly visit the Child at first but that she had become a little more consistent with visitation. Foster Mother stated that there was a period of several months in 2022 and 2023 when Mother did not visit the Child. She also stated that Mother has not always been good about communicating with Foster Mother, explaining that there was a delay in setting the Child up with an individualized education plan because Mother would not communicate. She explained that if a visit is canceled, the Child experiences what she called a "blackout spell," in which the Child shuts down before screaming or attacking those around him. She stated that too much change for the Child can cause him to have serious blackouts and that even if she has to take a detour from their regular driving route, the Child will have a severe reaction.

Foster Mother testified that she has witnessed Mother fail to engage with the Child during visits. Foster Mother stated that Mother has very little understanding of the Child's needs. According to Foster Mother, Mother does not ask about the Child's health problems or how to manage the Child's blackouts. When trying to explain the Child's leg braces and his difficulty walking, Mother responded: "I don't walk like that, or, I don't have those problems, or something to that nature." After visits with Mother, the Child may engage in extreme behaviors such as blackouts, aggression, and taking off his clothes. She described one instance when Mother told the Child to stop acting like a baby when he began to experience a blackout. Foster Mother stated that she thought the Child loved Mother but also mentioned that he still talked about the night she left him home alone. Foster Mother and her wife hope to adopt the Child.

The Juvenile Court found that DCS had failed to prove grounds for termination of Mother's parental rights. With respect to Father, the Juvenile Court found that DCS had proven by clear and convincing evidence all five of the grounds applicable to putative fathers as well as the ground of failure to manifest an ability and willingness to assume custody. The Juvenile Court found that twelve of the twenty best interest factors weighed in favor of termination of Father's parental rights but ultimately determined that termination of his parental rights would not be in the Child's best interest because there were no grounds to terminate Mother's parental rights and Father could support Mother. The GAL timely filed this appeal. DCS filed appellate briefing in support of the GAL. Neither the GAL nor DCS challenge the Juvenile Court's determination that DCS failed to prove the ground of substantial noncompliance with a permanency plan for either parent.

## DISCUSSION

We have consolidated and restated the issues on appeal as follows: (1) whether the Juvenile Court erred by finding that DCS failed to prove any grounds against Mother by clear and convincing evidence, (2) whether the Juvenile Court erred by finding that DCS failed to prove by clear and convincing evidence the grounds of abandonment by failure to visit and abandonment by failure to support against Father, and (3) whether the Juvenile Court erred by determining that termination of Mother's and Father's parental rights was not in the Child's best interest.

Our Supreme Court has explained the standard of review in parental rights termination cases as follows:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[2] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*,

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at

---

[4] Tenn. Code Ann. § 36-1-113(i).

246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "[A]ppellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 511.

At the time DCS filed its petition, the relevant termination grounds were set out as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

* * *

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a child is alleged to be a dependent and neglected child, and:

- 13 -

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

\* \* \*

(9)(A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person, or if no such petition is filed, at the time of the filing of a petition to adopt a child, is the putative father of the child may also be terminated based upon any one (1) or more of the following additional grounds:

(i) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;

(ii) The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102;

(iii) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(iv) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(v) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity, or as required in §

36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(2);

(B)(i) For purposes of this subdivision (g)(9), "notice" means the written statement to a person who is believed to be the biological father or possible biological father of the child. The notice may be made or given by the mother, the department, a licensed child-placing agency, the prospective adoptive parents, a physical custodian of the child, or the legal counsel of any of these people or entities; provided, that actual notice of alleged paternity may be proven to have been given to a person by any means and by any person or entity. The notice may be made or given at any time after the child is conceived and, if not sooner, may include actual notice of a petition to terminate the putative father's parental rights with respect to the child;

(ii) "Notice" also means the oral statement to an alleged biological father from a biological mother that the alleged biological father is believed to be the biological father, or possible biological father, of the biological mother's child;

* * *

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113 (West July 1, 2023 to June 30, 2024).

### **Mother**

Regarding abandonment by failure to support, the Juvenile Court made the following findings of fact and conclusions of law:

On October 5, 2023, Mother was ordered to pay $25.00 per month on current child support and $10.00 per month for retroactive support for a total of $35.00 per month for the support of the child. The support payments were set to begin on November 1, 2023. Mother admits that she did not pay her court ordered child support until prior to the trial on this TPR petition. She presented proof that all child support has been paid in full by the time of the trial. Furthermore, at each visit, Mother has provided snacks, food, and toys for the child. According to Mother, she has brought things for the child valued more than the child support order.

- 15 -

\* \* \*

The termination petition was filed on October 20, 2023 making the relevant four-month period pursuant to statute June 20, 2023 to October 20, 2023.

\* \* \*

As to Mother, it was clear that Mother had an order to provide support for the child. However, the child support hearing did not occur until October 5, 2023, fifteen days prior to the filing of this TPR petition. Although Mother concedes that she did not pay any child support payments during the relevant four-month time period prior to the filing of this petition, she was unaware at the time of any details on how to pay support. However, Mother did provide support through food, snacks, and toys during her visits with the child throughout the relevant time period. Therefore, DCS did not provide clear and convincing evidence that Mother willfully failed to support her child which would constitute abandonment as according to the statute.

(Paragraph numbering omitted.) The Juvenile Court found that DCS failed to present clear and convincing evidence to support this ground based on the fact that there was no child support hearing until fifteen days before the petition was filed, Mother's ignorance of how to pay child support, and Mother's in-kind support provided during visits.

The GAL and DCS argue that the Juvenile Court misapplied the law by determining that DCS had failed to prove the element of willfulness even though this element was removed from the statutory definition of abandonment in 2018 and lack of willfulness was added as an affirmative defense which the respondent parent bears the burden of raising and proving. They further argue that a parent's obligation to pay child support is not dependent on a court order; Mother never testified that she did not know how to pay child support; Mother testified that she did not think paying child support was "super important"; and there was no evidence demonstrating that Mother's in-kind gifts were paid during the relevant four-month period or constituted anything more than token support.

Mother, on the other hand, argues that even if the Juvenile Court improperly considered Mother's lack of willfulness, evidence established that Mother provided reasonable support through her in-kind gifts, which she provided at her bimonthly visits and totaled more in value than her $37 monthly support obligation.

At the time of the petition was filed, the statutory language for abandonment set forth:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i)(*a*) If the child is four (4) years of age or more, for a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102 (West July 1, 2023 to June 30, 2024).

DCS filed its petition on October 20, 2023. Therefore, the relevant four-month period for this ground is June 19 to October 19, 2023. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) ("[T]he applicable four month window for determining whether child support has been paid in the context of . . . failure to support includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed.").

We agree with the GAL and DCS that the Juvenile Court improperly considered Mother's lack of willfulness. In 2018, our General Assembly amended this statutory provision, removing the element of willfulness from this ground and making a respondent's lack of willfulness an affirmative defense. *In re Alexis S.*, No. E2018-01989-COA-R3-PT, 2019 WL 5586820, at *3 n.4 (Tenn. Ct. App. Oct. 29, 2019) ("In 2018, the Tennessee General Assembly amended this subsection to remove the element of willfulness from the definition of abandonment by failure to support or visit."). Therefore, the burden is no longer on the petitioner to prove a respondent's willfulness but rather on the respondent to prove that his or her failure was not willful. *In re Michael W.*, No. E2019-00107-COA-R3-PT, 2020 WL 405473, at *5 (Tenn. Ct. App. Jan. 23, 2020) ("Thus, under this version of the statute, the burden is not on Petitioner's to prove willfulness, but on the parent to prove that their failure was not willful."). Despite the Juvenile Court's determination that DCS failed to "provide clear and convincing evidence that Mother willfully failed to support her child," DCS did not bear the burden of proving the element of willfulness.

Rather, Mother's lack of willfulness is an affirmative defense that she failed to raise. The affirmative defense was neither raised by answer nor tried by implied consent. Mother never claimed that she was unable to pay child support. Mother, accordingly, waived this defense. *In re Chayson D.*, 720 S.W.3d 123, 136 (Tenn. Ct. App. 2023) (finding the mother's lack of willfulness argument waived because it was not raised in a responsive pleading or at trial). Moreover, the fact that there was no child support order in place until

- 17 -

fifteen days prior to the filing of the termination petition does not absolve Mother of her failure to pay child support. Tenn. Code Ann. § 36-1-102(H) provides: "Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." This Court has also explained: "A parent's obligation to support his or her child exists regardless of a court order requiring the parent to pay support." *In re Jacobe M.J.*, 434 S.W.3d 565, 572 (Tenn. Ct. App. 2013). Furthermore, based upon our review of the record, Mother never testified that she did not know how to pay child support. The evidence preponderates against this finding by the Juvenile Court.

Nevertheless, the Juvenile Court also based its decision on Mother's testimony that she brought food and toys to each visit, which she said were worth monetarily more than the $35 or $37 she was ordered to pay. DCS argues that Mother did not demonstrate that she provided any items during the determinative period and that she did not bring gifts to every visit. However, Mother testified: "Like, almost every either -- every other Monday if we had a visit he got something." Although Foster Mother and Ms. Applewhite-Joseph, the visitation supervisor, testified that Mother did not bring toys or food every visit, the Juvenile Court clearly credited Mother's testimony over theirs on this point. As we have often explained, "appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

DCS argues that Mother failed to demonstrate that she provided any items during the determinative four-month period. However, the burden of proof lies with the petitioner to prove that the parent failed to provide support. The Juvenile Court found that Mother visited the Child consistently and brought in-kind support to every visit. The evidence does not preponderate against the Juvenile Court's findings, given its implied credibility determinations.

Because the Juvenile Court credited Mother's testimony on this point and found that the in-kind support, such as food and gifts, equaled more than Mother's child support obligation, we affirm the Juvenile Court's determination that DCS failed to prove this ground by clear and convincing evidence. *In re Aniya B.*, No. E2024-00588-COA-R3-PT, 2025 WL 523285, at *7 (Tenn. Ct. App. Feb. 18, 2025) ("A parent can give 'the child in-kind support in the form of gifts, clothes, games, and food' during the Determinative Period, and such gifts can be considered as financially supporting the child.") (quoting *In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *18 (Tenn. Ct. App. July 21, 2021)).

The next ground applicable to Mother is persistence of conditions. With respect to this ground, the Juvenile Court made the following findings of fact and conclusions of law:

As of the filing of DCS's termination petition in October of 2023, the

- 18 -

child has been removed from Mother's legal and physical custody for a period of six (6) months by a court order executed in the underlying dependency and neglect proceedings that gave rise to this case. As of the first hearing date, it has been more than six months since the child entered DCS custody. The child was originally removed from Mother's custody due to an incident of a lack of supervision when she left the child at home alone while she returned to her place of employment. The child was left alone for two to three hours while she went back to work. The child got out of the home during that time and he was found by police officers. On her return to her house, Mother was arrested and charged with child endangerment as a result of the incident. The minor child was approximately four (4) years old at the time of this incident. The child could have been seriously harmed. Mother did acknowledge that this was the worst parenting decision she has ever made and understands the seriousness of the situation.

Mother testified that her criminal charge was retired in October of 2023 through the Davidson County Criminal Court. Mother has completed multiple parenting-focused tasks during the time that the child has been in custody which were designed to remedy the issues that brought the child into DCS care, including a parenting assessment, parenting classes, and a functional parenting assessment. Mother thoroughly acknowledged her mistake and regrets her decision-making related to the underlying incident that resulted in her child being removed from her care. Mother testified that she would take different approaches in the future including never leaving her child alone without a caregiver. She participated in all assessments and classes that were set up for her related to parenting skills. Although not as soon as DCS would have expected, Mother acknowledged that she understood the child experienced trauma related to this incident.

After the child was removed from Mother's custody, he was eventually diagnosed with autism. Throughout the two days of trial on this petition, DCS attempted to present evidence that Mother would be unable to appropriately parent the child due to his special needs. Although Mother was not aware that the child was autistic while he was in her care, she did notice a speech delay and sought and secured speech therapy services for him prior to his removal.

DCS alleged that Mother had limited understanding of the child's autism and attempted to tie these concerns to a persistence of conditions issue for Mother. DCS presented the child's Allied Behavioral Health therapist, Carlee Lammers, as a witness related to her work with the child. However, Ms. Lammers did not begin therapy with the child until March 2024 (several months after the termination petition was filed). Ms. Lammers testified that

she has included the foster parent in many of the sessions with the child and received the bulk of the history and concerns about the child's case from the foster parent. Ms. Lammers has taught and worked with the foster parent on strategies for managing the child's behaviors and dysregulation. Notably, Ms. Lammers had never been introduced to Mother, never had a conversation with Mother to get any information about the child, and therefore never had an opportunity to discuss or work on any strategies for managing the child's behaviors with Mother.

Ms. Lammers further testified that she believed the child loves his biological Mother but that there is therapeutic work which needs to be done by the child as well as Mother to understand and process his feelings and trauma. Ms. Lammers explained what would be needed to eventually integrate Mother into the child's therapy. However, DCS has not attempted to begin that process or to even inform Mother of the child's progress and work with the therapist. DCS has done little to connect Mother with the therapist and the information needed for Mother to better understand the child's disabilities.

DCS also presented the therapeutic visitation supervisor, Tameka Applewhite-Joseph, as a witness as to the child's visitations with Mother. Both Mother and Ms. Applewhite-Joseph testified that the child was typically regulated during visitations with Mother. Mother testified that although she had heard about the child's dysregulation and autism-related struggles from others, she had not witnessed the level of behaviors and meltdowns described during her time with the child. Mother has not had the opportunity to fully grasp the severity of his diagnosis and has not had the opportunity to show her ability to manage his condition. The child's diagnosis came after he was removed from Mother's custody and there has been no effort made by DCS to provide services directly related to managing the child's autism other than talking to her about his episodes and struggles. There have been no autism-specific services put into place for Mother and the child to work together in a therapeutic setting on techniques and strategies for managing this type of condition. Furthermore, DCS's only integration of Mother into the child's services has been to provide a video link where Mother can watch the child participate in feeding therapy and physical therapy. Unfortunately, Mother has had no opportunity to be an active participant in the therapy sessions.

DCS's proof centered on the concerns about Mother's understanding of ABA therapy. However, the proof showed that the child had not actually been enrolled in ABA therapy specifically. Mother testified that she had read literature and tried to research autism but has not been given an opportunity to work directly with the child therapeutically. Mother was not aware of Ms.

- 20 -

Lammers' services with the child until the trial on this matter because she had not been informed and/or introduced to her.

Based on reported concerns regarding Mother's understanding of the child's medical needs, the Court ordered a functional parenting assessment for Mother. The only finding from that assessment was that Mother could benefit from additional education specific to parenting a child with autism. Despite this being the sole recommendation from the assessment, DCS made no effort to assist the Mother with following the recommendation. Mother instead was left to her own devices to research autism further as recommended. Mother testified that she made several calls to autism-specific service providers, but that without having the child available to work directly with her and the providers, there were no hands-on education and support that could be provided. The child and Mother would need to have the opportunity to work these services together.

The issue present at the removal and in the adjudication was a Lack of Supervision. This condition does not persist at the time of the trial in this matter. All the other issues alleged by DCS as a persistence of conditions were not present at the time of the removal from Mother, specifically, the child's autism. Mother did seek medical services for the child while in her care in the form of speech therapy, which demonstrates that she understood there was some delay in his development. Therefore, there is not proof of the ground for termination as to persistent conditions. Thus, DCS has not proven to this Court, by clear and convincing evidence, the ground of persistence of conditions against Mother.

The GAL and DCS argue that the Juvenile Court misapplied the law in two respects: (1) the Juvenile Court incorrectly discounted conditions that were not present at the time of the Child's removal from Mother and (2) the Juvenile Court improperly considered DCS's lack of efforts in assisting Mother. They further argue that Mother does not have an understanding of or demonstrated commitment to addressing the Child's autism diagnosis and therapies. Mother argues that she has demonstrated such understanding and commitment.

In order to prove this ground, DCS was required to prove (1) the Child had been removed from Mother's home or custody by court order for a period of six months; (2) the conditions that led to the Child's removal persist and prevent the Child's safe return to Mother **or** other conditions exist that would, in all reasonable probability cause the Child to be subjected to further abuse or neglect; (3) there is little likelihood that these conditions will be remedied at an early date such that the Child can be safely returned to Mother in the near future; and (4) the continuation of Mother's and the Child's relationship greatly diminishes his chances of early integration into a safe, stable, and permanent home. Tenn.

Code Ann. § 36-1-113(g)(3). The first element is undisputed.

This Court has previously explained this statutory provision as follows:

> The purpose behind this ground for termination is " 'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.' " In cases involving this ground, it is not necessary to prove that a parent-child relationship cannot be salvaged, nor is it necessary to show that a parent is currently harmful to a child's safety or emotional stability. The statutes governing termination of parental rights recognize a child's need for a permanent, stable environment. Accordingly, the question is the likelihood that the child can be safely returned to the custody of the parent, not whether the child can safely remain in foster care with periodic visits with the parent. When analyzing this ground for termination, we focus on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them.

*In re James V.*, No. M2016-01575-COA-R3-PT, 2017 WL 2365010, at \*8 (Tenn. Ct. App. May 31, 2017) (internal citations omitted).

We agree that the Juvenile Court erred by stating that the conditions needed to have existed at the time of the Child's removal. The statute provides that DCS can prove this ground by either showing that conditions that existed at the time of the Child's removal persist **or** that other conditions exist that prevent the child's safe return to the care of the parent. The Juvenile Court misapplied the law in its consideration of this ground.

In determining that unsafe conditions no longer existed, the Juvenile Court considered the Mother's remorse and commitment to never leave the Child alone again and her completion of all the assessments required by DCS. However, the Juvenile Court's findings are largely based on DCS's failure to assist Mother in learning about autism or incorporating her into his therapy sessions with Ms. Lammers. Our Supreme Court has previously stated:

> [N]othing in the plain language of Section 36-1-113 indicates that a petitioner in a proceeding to terminate parental rights is in fact required to put on proof of DCS's reasonable efforts to assist the respondent parent. Rather, the language of the statute indicates only that the trial court is to consider DCS's reasonable efforts, or the lack thereof, in determining whether termination of the parent's rights is in the child's best interest.

*In re Kaliyah S.*, 455 S.W.3d 533, 554 (Tenn. 2015). DCS's lack of efforts is not an element of this ground; rather, "we focus on the results of the parent's efforts at

improvement rather than the mere fact that he or she had made them." *In re James V.*, 2017 WL 2365010, at *8. DCS's efforts, or lack of efforts, to support Mother would be more appropriately addressed in the Juvenile Court's best interest determination. The Juvenile Court also misapplied the law in this respect as well.

Furthermore, the Juvenile Court made few, if any, findings related to the extensive testimony about the Child's needs due to his autism diagnosis or Mother's approach to these issues. DCS presented relevant testimony about Mother's responses to the Child's behaviors and needs that went unaddressed by the Juvenile Court. In this case, Mother has clearly made efforts, testifying that she has conducted some Internet research on autism and called multiple facilities to learn about autism. However, DCS presented evidence of Mother's poor responses to the Child's condition.

For instance, although Ms. Applewhite-Joseph testified that Mother's behavior during visits had improved, she also testified that Mother could be dismissive of the Child's behaviors and that she was in denial about his diagnosis. Both Foster Mother and Ms. Applewhite-Joseph testified that the Child had extreme meltdowns after visits with Mother. Ms. Applewhite-Joseph also testified that Mother took the sensory chew toy from the Child as he was chewing on it and told him he was not a dog and did not need the toy. Mother admitted she said this to the Child but stated that she did not know the purpose of the toy until after. Ms. Applewhite-Joseph testified that when she would try to inform Mother of certain aspects of his behavior or his emotional state on any given day, Mother would ignore her. Mother stated that she did not ignore her. Ms. Applewhite-Joseph further explained that her greatest concern was Mother's lack of understanding of the Child's needs and diagnosis and that there was a disconnect between his needs and her understanding. Ms. Lammers testified that the Child told her that Mother called him fat; Mother testified that she had merely called him "big." Mother testified that she thought the Child's speech delay was his way of seeking attention. The Juvenile Court did not make findings of fact or credibility determinations about this relevant testimony.

Foster Mother testified that Mother does not ask questions about the Child's health. For instance, when informed of the Child's issues with walking and his need for leg braces, Mother merely stated that she did not have that problem. Foster Mother further testified that Mother never asks about the Child's blackouts or how to deal with them. In fact, Foster Mother testified that Mother told the Child to stop acting like a baby when he was about to have a blackout, which further induced the blackout. Foster Mother also stated that Mother's lack of communication caused a delay in setting up an individualized education plan for the Child. The Juvenile Court did not make a credibility determination as to Foster Mother or making findings of fact as to her relevant testimony.

Mr. Irom testified that Mother does not consistently attend and observe the Child's therapies through a virtual link that was provided to her. Mother testified that she consistently observes the Child's therapies via video link. Mr. Irom also testified he had

- 23 -

been unable to make contact with her for the first four months after he took over the case in June 2024. He stated that she often lied about not receiving his emails or text messages. The Juvenile Court did not make findings related to this testimony or resolve the conflicting testimony.

Moreover, Foster Mother, Ms. Lammers, and Ms. Applewhite-Joseph all testified to the importance of routine in the Child's life. Foster Mother explained that the Child will suffer a meltdown at the slightest change in routine such as when she has to take a detour and is unable to drive their normal route. In describing the Child's reaction to canceled visits with Mother, Foster Mother explained that the Child will have a blackout and then start screaming or attacking those around him. The Juvenile Court did not make any findings about this relevant testimony.

In addition, although the Juvenile Court made findings about Mother's employment history in its consideration of failure to manifest ground, it did not consider the fact that Mother was fired from her job two weeks before trial. Nor did it consider the fact that Mother is two months behind on rent. Based on Mother's testimony, her job with the temp agency requires her to frequently drive to Huntsville, Alabama, although she could request jobs in Tennessee. The Juvenile Court did not demonstrate consideration of much of this relevant testimony.

The Juvenile Court also did not appear to address favorable testimony toward Foster Mother and her care of the Child over the past three years of his life. The Juvenile Court simply left much of this significant testimony unaddressed in its discussion of this ground, and where Mother's testimony contradicted the testimony of DCS's witnesses, the Juvenile Court did not resolve these differences in favor of Mother or DCS. The Juvenile Court may have assigned little weight to some or all of this testimony, or it may have found that DCS's witnesses lacked credibility. We, however, have no way of knowing if it even considered this relevant testimony. If the Juvenile Court assigned little or no weight to this testimony, it should have said so and explained why.

Because the Juvenile Court misapplied the statutory language for the ground of persistent conditions and left relevant testimony unaddressed, we are unable to conclude that it properly dismissed the petition to terminate Mother's parental rights, and we vacate the judgment and remand for the Juvenile Court to enter an order with specific findings of fact regarding the relevant testimony and correctly applying the law.

The next ground we consider is Mother's alleged failure to manifest an ability and willingness to assume custody of the Child. The Juvenile Court found:

> Mother has manifested an ability and willingness to assume legal and physical custody or financial responsibility of the child. Furthermore, placing the child in Mother's legal and physical custody would not pose a

risk of substantial harm to the physical or psychological welfare of the child.

Mother testified that if the child were returned to her custody, she would attempt to have as many of his services as possible connected with the school setting, such as ABA therapy, physical therapy, and occupational therapy. She also acknowledged that he may need some services in the community and through outside providers, and that she has transportation to ensure that he can attend all medically necessary appointments and services and would adjust her work schedule to meet his needs.

Mother testified to her employment history as trying out different fields to find her true career interest. She has worked in customer service, as well as temporary staffing agencies, but more recently pursued and received her Certified Nursing Assistant ("CNA") license so that she could be in a field related to caregiving for others since that aligns with the needs of her child. Mother was in the process of interviewing for new CNA positions at the time of the trial and had most recently worked in a CNA role at her previous employer for approximately one year. She further testified that she picked up shifts through a temporary staffing agency when she was transitioning between jobs.

Mother also testified to her housing history during the time that the child has been in DCS custody. Mother has attempted to find places to live in Tennessee for the duration of the time the child has been in foster care, since she understood that it would be easier to have the child returned to her custody if she remained in Tennessee instead of moving back to Alabama where her family lives. She testified to renting two rooms from an elderly woman in a home for a time period, and that she would also return to Alabama to be with family during times between having an active lease. Mother submitted her current lease as an exhibit at the trial, which was for a duration of one (1) year and with an address in Lewisburg, Tennessee. DCS personnel visited this home and observed the child's room, including bedding and clothing ready for the minor child.

Mother has continued to visit with the child throughout his time in DCS custody to maintain her bond and connection with him and so that he maintains a loving relationship with his Mother. She has continued to provide items for him at the visits as well throughout his time in DCS custody. Mother has at times throughout this case petitioned the Court for a return of custody only to have other tasks added to her permanency plan for which she has complied. Mother has demonstrated the willingness and ability to resume custody of the child and testified regarding her family support system, which is a strength for her. The only issue is one of logistics

in that her family lives about an hour outside of Tennessee state lines. This distance would not be an issue nor would her travel to be around her family if the child were not in the custody of DCS.

Furthermore, placing the child with his Mother would not pose a risk of substantial harm to the physical and psychological welfare of the child. Although the child is bonded with his current foster family, there is no question that the child is also bonded with Mother. The child has consistent visits with Mother. According to the testimony of both Mother and Tameka Applewhite-Joseph, the child enjoys visits with Mother. Furthermore, the child's behavioral issues have not been challenging during the visits with Mother. As according to Ms. Mersadiez B[.], the foster parent, the child needs consistency and has difficulty adjusting with change. However, in this case, the court finds that Mother would be able to address the child's autistic needs and ensure consistency. Mother has expressed her understanding of the child's needs and the trauma he has endured because of her actions. By Mother's consistency of working with DCS in order to regain custody, the court believes Mother would not pose any additional risk to the child. Therefore, there are not grounds for termination as to Mother's failure to manifest an ability and willingness to assume legal and physical custody of the child. DCS has not proven, by clear and convincing evidence, the ground for termination contained in T.C.A. § 36-1-113(g)(14) as to Mother.

Although we agree with the Juvenile Court's finding that Mother had demonstrated a willingness to assume custody, we remand for it to provide more specific findings as to Mother's ability to assume custody, particularly with respect to her ability to properly address the Child's autism, and whether return to her custody poses a risk of substantial harm to the Child. The Juvenile Court based its finding of ability on Mother's plan to continue the Child's therapies, her employment history, her satisfactory housing, her visitation, her gifts during visits, and her family support system in Alabama. However, the GAL and DCS's main contention is that Mother does not grasp the severity of the Child's autism. This is at the heart of the case, yet the Juvenile Court merely concluded that Mother would be able to address the Child's needs, provide consistency, and had "expressed her understanding" of the Child's needs and trauma. Given the great quantity of evidence that contradicted these conclusions, the Juvenile Court should have provided specific findings of fact that indicate to this Court *why* it found that Mother was able to provide for the Child's needs.

The Juvenile Court did not address the large amount of testimony that Mother's actions did not demonstrate an understanding of the severity of the Child's autism, despite her expressions at trial. Much of the testimony regarding Mother's understanding and ability to manage the Child's several diagnoses was conflicting, and the Juvenile Court either did not demonstrate consideration of this evidence or make credibility

- 26 -

determinations resolving the conflicting testimony.

For instance, although the evidence supports the Juvenile Court's finding that the Child did not manifest behavioral issues during visits, the Juvenile Court did not address Foster Mother's and Ms. Applewhite-Joseph's testimony that the Child experienced meltdowns after visits. The Juvenile Court did not credit or discredit their testimonies. The Juvenile Court did not address Ms. Lammers' testimony that the Child was scared when Mother invaded his personal space. The Juvenile Court did not resolve the conflicting testimony regarding Mother's response to the Child's sensory chew toy. The Juvenile Court did not resolve the conflicting testimony about Mother calling the Child "fat" as relayed by Ms. Lammers or merely "big" as recalled by Mother. The Juvenile Court made no findings with respect to Foster Mother's testimony about Mother's apparent disinterest in the Child's blackouts or medical issues. The Juvenile Court did not address Foster Mother's testimony that Mother told the Child to stop acting like a baby, triggering the Child to experience a blackout. The Juvenile Court did not address the discrepancy between Mr. Irom's testimony that Mother does not frequently observe therapies and Mother's testimony that she frequently observes therapies. The Juvenile Court provided a conclusory statement that Mother would be able to address the Child's autistic needs and ensure consistency without making any findings one way or the other about this relevant testimony.

Moreover, in its consideration of the ground of persistent conditions, the Juvenile Court found that "Mother has not had the opportunity to fully grasp the severity of his diagnosis and has not had the opportunity to show her ability to manage his condition," implying that Mother does not in fact fully grasp the severity of his diagnosis and has not demonstrated an ability to manage his condition. In its best interest discussion, the Juvenile Court noted that "Mother needs to work with the therapist to ensure she understands the magnitude of the child's autism and post-traumatic stress disorder," although it found that this should not prevent Mother from attempting to regain custody of the Child. These findings diminish the Juvenile Court's finding under this ground that Mother expressed an understanding of the Child's autism and its conclusory statement that Mother has the ability to address the Child's needs.

Furthermore, the Juvenile Court found Mother's housing and employment history weighed in her favor. However, at the time of trial, Mother testified that she had been fired two weeks before trial. The Juvenile Court did not address this. If the Juvenile Court decided to place little weight on this fact, it should have explained why. She is two months behind on rent because she paid her entire child support debt in two lump sums after failing to consistently pay child support because she did not think it was "super important" because she was providing the child with food and toys during visits. This went unaddressed. Again, if the Juvenile Court placed little weight on this fact, it should have explained why. The Juvenile Court did not appear to consider much of this testimony or how it would impact the Child's stability if returned to Mother's custody.

Ultimately, DCS presented an abundance of relevant testimony regarding Mother's inability to properly address the Child's needs. Whether the Juvenile Court credits Mother's testimony over all other witnesses is beyond our review absent clear and convincing evidence to the contrary. Without specific findings addressing this testimony and resolving the differences in testimony based on credibility determinations, we are unable to conclude one way or the other whether the Juvenile Court's conclusions that Mother is able to address the Child's needs and provide consistency are supported by a preponderance of the evidence. We accordingly remand for the Juvenile Court to provide specific findings addressing all the testimony relevant to Mother's ability to appropriately address the Child's needs.

Because we remand for the Juvenile Court to revisit its findings regarding the grounds of persistent conditions and failure to manifest an ability and willingness to assume custody, properly apply the statutory language, and provide more specific findings of fact regarding Mother's ability to address and understand the Child's significant needs, we do not reach the issue of whether the Juvenile Court erred in not proceeding to consideration of the best interest factors outlined in Tenn. Code Ann. § 36-1-113(i).

## Father

For the grounds of abandonment by failure to visit and abandonment by failure to support, the Juvenile Court made the following findings of fact and conclusions of law:

> As to Father, he acknowledges that his establishment of paternity occurred after this petition was filed. He also acknowledges that he was aware that the child was in DCS custody. Father admits that he received a copy of the permanency plan. Father also admits that he was incarcerated off and on during the time the child has been in DCS custody, which made him unable to visit or participate in the permanency plans. However, DCS also acknowledged during testimony that Father would not have been able to have any visits with the child until he was legitimated as the Father of the child.

> * * *

> The termination petition was filed on October 20, 2023 making the relevant four-month period pursuant to statute June 20, 2023 to October 20, 2023. Father has not had any visitation with the child except for one time when Mother was having her virtual visit and Father was on the video in the background. Father was incarcerated during part of the time the child was in DCS custody, although it is not clear if he was incarcerated during the four-month period prior to the filing of the TPR petition. According to Father's

- 28 -

testimony, he did request visits once he was released from incarceration in 2024. Furthermore, DCS acknowledged that Father would not be allowed visits until he was legitimated as the father. Therefore, DCS has failed to prove that Father's lack of visitation was willful. Therefore, it does not constitute abandonment as according to the statute.

\* \* \*

As indicated previously, Father has failed to provide any financial support for the child since placement with DCS. Although Father was aware that the child was in DCS custody and did not provide any support, there is no proof that he was able to work and pay support during the relevant time period. According to the testimony, Father was incarcerated off and on during the entire time the child has been in DCS custody. DCS did not provide clear and convincing evidence that Father willfully failed to support his child which would constitute abandonment as according to the statute.

(Paragraph numbering omitted.)

Although DCS does not contest the Juvenile Court's findings with respect to these grounds, the GAL argues that the Juvenile Court placed the burden of proving willfulness on DCS, rather than placing the burden of proving absence of willfulness on Father. As we have previously explained, the petitioner no longer bears the burden of proving willful failure; rather, the respondent bears the burden of raising and proving the affirmative defense of absence of willfulness.

We disagree with the Juvenile Court's conclusion that Father's failure to visit was not willful due to his own failure to establish paternity. Father had years to establish paternity and begin visiting the Child, but he did not establish paternity until after the termination petition was filed and offered no good reason for his delay. Father's inability to visit was caused by his own inaction, which he could have cured long before a petition was ever filed. *See In re Jaylah W.*, 486 S.W.3d 537, 551-52 (Tenn. Ct. App. 2015) ("It is well-settled that a trial court's order requiring that a parent complete some task or meet a condition before resuming visitation does not preclude a finding a willfulness.").

Nevertheless, Father's testimony was unclear as to whether or not he was incarcerated for part of the alleged four-month determinative period between June 19, 2023 and October 19, 2023. Father testified that his first stint of incarceration was for close to a year long and that he was either released from incarceration in March or May 2023, but then he later testified that he had only been out of prison for six months when he was re-incarcerated in May 2024. If the latter is true, Father would have been incarcerated during the four-month determinative period.

If Father was incarcerated during all or part of the four-month period, DCS should have alleged abandonment by an incarcerated parent under Tenn. Code Ann. § 36-1-102(1)(A)(iv)(a)(1) or (b)(1), which provides a different four-month determinative period than subsection (1)(A)(i)(a), as pled by DCS in its petition. As we have previously explained, "it is a petitioner's burden to 'arrive at the correct statutory period prior to filing [a] petition for termination of parental rights.'" *In re Jack C. L.*, No. E2022-01803-COA-R3-PT, 2024 WL 2316641, at *4 (Tenn. Ct. App. May 22, 2024) (quoting *In re Haskel S.*, No. M2019-02256-COA-R3-PT, 2020 WL 6780265, at *6 (Tenn. Ct. App. Nov. 18, 2020)). Neither the GAL nor DCS address this issue and did not appear to at trial either. Because we are unable to conclude whether or not the proper four-month period was pled, and the testimony did not present a clear picture of when the correct four-month period began and ended, we agree with the Juvenile Court that DCS failed to present clear and convincing evidence to establish the grounds of abandonment by failure to visit and abandonment by failure to support. See *In re Jack C. L.*, 2024 WL 2316641, at *5 (reversing a trial court's finding of an abandonment ground when the petitioner "did not appropriately plead the relevant period at the outset, nor did she present clear and convincing evidence of same at trial").

With respect to the remaining grounds applicable to Father, the putative father grounds and the ground of failure to manifest an ability and willingness to assume custody, the Juvenile Court made the following findings of fact and conclusions of law:

> The respondent, [Father], has failed to manifest, by act or omission, an ability and willingness to assume legal and physical custody or financial responsibility of the child. Furthermore, placing the child in [Father's] legal and physical custody would certainly pose a risk of substantial harm to the physical or psychological welfare of the child.

> The child does not have a bonded relationship with Father. Father has had no contact with the child. Father has only recently attempted to visit with the child. Furthermore, he has not attempted to support the child in any way. The child would not recognize Father and became very confused the only time Mother attempted to introduce Father to the child. Father conceded at trial that he was not in any condition to regain custody of the child. Father was primarily in support of Mother regaining custody of the child. Father has not attempted to do anything to regain legal or physical custody of the child. He has not manifested any ability or willingness to assume legal or physical custody of his child. Placing the child in Father's legal and physical custody would certainly pose a risk of substantial harm to the physical or psychological welfare of the child.

\* \* \*

- 30 -

The proof establishes that the alleged Father . . . had notice from Mother that he was the father of the minor child. Father testified that he was at the hospital at the child's birth, but just never signed a birth certificate or a Voluntary Acknowledgement of Paternity. However, after Father was released from incarceration and after the TPR petition was filed, Father finally filed a Petition to Determine Paternity. Father was found to be the Father of [the Child]. Although Father did not file a petition nor take any other action to establish paternity of the child within 30 days of notice that he was the alleged father, he has done so prior to the start of this trial.

Father has provided no financial support for the child since he has been in foster care and otherwise has failed to make reasonable and consistent payments for the child's support. Father has not visited the child a single time since the child has been in DCS custody, except the one time Mother was having a virtual visit and Father was on the screen in the background. DCS has proven, by clear and convincing evidence, the ground of failure to establish/exercise paternity pursuant to T.C.A. §36-1-113(g)(9)(A) and §36-1-117(c).

The evidence does not preponderate against these findings.

With respect to the ground of failure to establish paternity, Tenn. Code Ann. § 36-1-113(9)(A)(v), the petitioner must prove that the putative father failed to file a petition to establish paternity within thirty days after notice of alleged paternity. Father admitted that he knew he was the Child's father at the Child's birth. Yet Father acknowledged at trial that he did not file a petition to establish paternity until after DCS filed the petition to terminate his rights many years after he had notice. Clear and convincing evidence supports this putative father ground.

Subsection (9)(A)(i) provides that a putative father's parental rights may be terminated when he has failed, without good cause or excuse, to make reasonable and consistent child support payments. Father acknowledged never having provided any child support payments, despite testifying that he knew he had an obligation to support the Child and "always kept a job" when he was not incarcerated. Clear and convincing evidence supports this ground for termination.

Subsection (9)(A)(ii) provides that a putative father's parental rights may be terminated when he has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation. Father testified that he visited the Child virtually once during the custodial period. Father failed to seek reasonable visitation by failing to establish paternity until after the termination petition was filed. Clear and convincing evidence supports this ground.

Subsection (9)(A)(iii) provides that a putative father's parental rights may be terminated when he has failed to manifest an ability and willingness to assume custody of the child. Father has no relationship with the Child. He has visited him once over video. He delayed establishing his paternity of the Child for many years and did not do so until DCS filed a petition to terminate his rights. He was incarcerated for two different periods during the custodial period. His license has been revoked, and he has no transportation. He lives with his grandparents who do not want the Child to live with them. When asked whether he has ever taken care of a child with autism, Father responded: "It can't be hard." Father has essentially been a stranger for most of the Child's life and has not demonstrated a serious attitude toward regaining custody of the Child. For these reasons, we conclude that clear and convincing evidence demonstrated that Father neither has the ability nor the willingness to assume custody of the Child.

Subsection (9)(A)(iv) provides that a putative father's parental rights may be terminated when placing the child in his legal and physical custody would pose a risk of substantial harm to the child's welfare. As previously explained, this Child has many needs due to his autism and post-traumatic stress disorder diagnoses, and he requires multiple therapies and stability. Father has not demonstrated that he can meet the Child's needs or even understands them for reasons previously explained. Furthermore, he is practically a stranger to the Child. Clear and convincing evidence supports this ground for termination.

For the foregoing reasons, we also conclude that DCS established the ground of failure to manifest an ability and willingness to assume custody pursuant to Tenn. Code Ann. § 36-1-113(g)(14).

We next address whether the Juvenile Court erred in determining that termination of Father's parental rights was not in the Child's best interest. When DCS filed its petition, Tenn. Code Ann. § 36-1-113(i) set forth the following:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

- 32 -

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

- 33 -

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

The Juvenile Court made the following findings of fact and conclusions of law:

Having determined there are grounds for terminating Father's parental rights, the Court must determine if to do so is in the best interest of the child. The Court has considered the non-exclusive factors found at T.C.A. § 36-1-113(i)

and makes the following findings:

1. It is in the child's best interests for termination to be granted as to Father as the child has a critical need for stability and continuity of placement through his minority.

2. It is in the child's best interests for termination to be granted as to Father, as Father has failed to demonstrate continuity and stability in meeting the child's basic material, educational, housing and safety needs.

3. It is in the child's best interests for termination to be granted as to Father, as Father and the child do not have a secure and healthy parental attachment and there is no reasonable expectation that Father can create such an attachment.

4. It is in the child's best interests for termination to be granted as to Father, as Father has failed to maintain regular visitation or other contact with the child.

5. It is in the child's best interests for termination to be granted as to Father, as Father has failed to demonstrate a lasting adjustment of circumstances, conduct or conditions to make it safe and beneficial for the child to be in his home.

6. It is in the child's best interests for termination to be granted as to Father as he has failed to take advantage of available programs, services or community resources to assist in making a lasting adjustment of circumstance, conduct or conditions.

7. It is in the child's best interests for termination to be granted as to Father, as he has failed to demonstrate any sense of urgency in seeking custody of the child.

8. It is in the child's best interests for termination to be granted as to Father, as he has failed to demonstrate any sense of urgency in addressing the circumstances, conduct or conditions that made an award of custody unsafe and not in the child's best interest.

9. It is in the child's best interests for termination to be granted as to Father, as he has never provided safe and stable care for the child.

10. It is in the child's best interests for termination to be granted as to Father, as Father has not demonstrated an understanding of the basic and specific

needs required for the child to thrive.

11. It is in the child's best interests for termination to be granted as to Father, as he has failed to demonstrate the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs in which the child can thrive.

12. It is in the child's best interests for termination to be granted as to Father, as he has failed to consistently provide financial support to the child.

In this case, the child has been in DCS custody for several years. Fortunately, the child has been in the same foster home since he entered DCS custody. The child has a close and loving relationship with the foster parents. The child is also bonded with Mother. Mother has completed every requirement on the permanency plans, has maintained visits with the child, and has provided financial support for the child. Although Mother needs to work with the therapist to ensure she understands the magnitude of the child's autism and post-traumatic stress disorder, this should not prevent her from attempting to regain custody of the child. However, the child has had very little contact with Father since he came into custody and has no relationship with him. A meaningful relationship has not been established between the child and Father.

\* \* \*

Although the Court has found by clear and convincing evidence that grounds do exist to terminate Father's parental rights and there are many best interest factors which would support the termination, the Court finds that it would not be in the child's best interest to terminate Father's rights since there are no grounds to terminate Mother's parental rights. According to the best interest analysis, the child could be returned to Mother's custody. Father acknowledges that he is not in the position to regain custody of the child but could provide support for Mother. Therefore, the Court declines to terminate the parental rights of either Mother or Father.

The Juvenile Court provided conclusions of law, rather than findings of fact, when considering whether termination of Father's parental rights was in the Child's best interest. The Juvenile Court merely stated that each of the twelve factors that it considered weighed in favor of termination without providing any factual findings to support those conclusions. This is reversible error, and we must vacate the Juvenile Court's judgment and remand this case for the Juvenile Court to provide specific findings of fact *in support* of its conclusions of law. *See In re Bentley E.*, 703 S.W.3d 298, 304 (Tenn. 2024) (vacating the trial court's decision to terminate and remanding for the trial court to enter sufficient factual findings

and conclusions of law for the best interest analysis because the trial court provided conclusory statements for several factors without providing factual findings). Although the Juvenile Court ultimately decided that it was not in the Child's best interest to terminate Father's parental rights, this was based solely on the fact that it did not terminate Mother's parental rights and that he could support Mother. Given we have only conclusions of law and this one fact to review, we must remand for the Juvenile Court to provide proper factual findings that explain its conclusions.

## **CONCLUSION**

For the foregoing reasons, we affirm the Juvenile Court's determination that DCS failed to establish the ground of abandonment by failure to support by Mother and the grounds of abandonment by failure to visit and abandonment by failure to support by Father. We affirm the Juvenile Court's determination that clear and convincing evidence supported the remaining grounds alleged against Father. However, we vacate the judgment because the Juvenile Court made several errors of law and failed to provide sufficient findings of fact with respect to testimony relevant to the grounds of persistent conditions and failure to manifest an ability and willingness to assume custody against Mother and the best interest factors as applied to Father. We remand this case for the Juvenile Court to properly apply the law and provide sufficient findings of fact in support of its conclusions, including an analysis of the best interest factors as to Mother, if necessary. We further remand for collection of costs below. Costs are assessed one-half against the appellees, Bria B. and James J, and one-half against the appellants, the GAL and DCS.

_____
D. KELLY THOMAS, JR., SPECIAL JUDGE